**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| SHANDI MILLER, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br>vs.<br><br>KASPER GROUP LLC, a Delaware limited liability company; and DOES 1 through 15, inclusive,<br><br>Defendants. | Case No. 1:26-cv-09392<br><br>**CLASS ACTION COMPLAINT FOR (1) VIOLATION OF THE CALIFORNIA COMPREHENSIVE COMPUTER DATA ACCESS AND FRAUD ACT (CAL. PENAL CODE § 502); (2) COMMON LAW FRAUD, DECEIT AND/OR MISREPRESENTATION; (3) UNJUST ENRICHMENT; (4) INTRUSION UPON SECLUSION** |

## INTRODUCTION

1. Plaintiff, a California citizen, on her behalf and on behalf of a class of similarly situated persons, brings this action against Defendant Kasper Group LLC ("Defendant" or "Kasper"). Kasper, headquartered in New York City, sells women's clothing at retail "outlet" stores and through its website, located at https://www.kasper.com/ (the "Website").

2. Defendant has installed and deployed data broker and social media/advertising platform software on its Website to secretly collect data about visitors to the Website, their devices, locations and activity to identify who they are, and target them with unwanted marketing. Further, the software facilitates the profiling of visitors, and the tracking of their internet browsing on a future basis, regardless of whether visitors have opened accounts on the social media/advertising platforms.

3. The data broker and advertising platform software on the Website (the "Third-Party Code") facilitates the identification of individual visitors through a process referred to as "browser fingerprinting." The Third-Party Code enables fingerprinting by ***transmitting visitors' data to at least two data brokers and at least one social media/advertising company***. In addition, the Third-Party Code facilitates the correlation of data collected during visits to the Website and its correlation with extensive external records that these third parties already have about most

Californians. The correlation enables the creation or enhancement of profiles on individuals for commercial exploitation, including the sale of data about individuals.

4. Both Defendant and the third-party data collectors behind the Third-Party Code benefit commercially and financially from this activity. Defendant benefits because collected visitor data, and the identification of visitors using that data, are used to, *inter alia*, assess, analyze and target specific visitors with ads for Defendant's products. The data collectors benefit because they can commercially exploit the data the Third-Party Code collects, including, in the case of data brokers, selling the data.

5. The collection and transmission of data commences before a visitor to the Website has any opportunity to either reject or consent to the use of cookies or tracking software. Soon after the homepage of the Website loads on a visitor's device, a banner offering to permit the visitor to decline "cookies" that Kasper and its "partners" use to "enhance [a visitor's] experience" appears. The banner also contains a hyperlink reading "Manage preferences" that prompts a pop up window captioned "Cookie and privacy preferences" to appear. The pop up informs the visitor that, "You control your data," and that she can "choose which cookies to allow." Plaintiff, like many other visitors to the Website, used Defendant's ***consent interface*** – consisting of the banner and the pop up – to reject the use of one or more of 3 categories of cookies that enable the sharing of visitor data with third parties, and its sale by such parties, on the Website.

6. Defendant's representations regarding visitors' power to prevent or halt the operation of cookies that facilitate data-sharing and data-selling are fraudulent. Using the consent interface to reject the use of cookies not deemed "Required" by Defendant – cookies that share data with third parties who track individuals' future internet browsing and that facilitate the compiling of detailed profiles on individuals for commercial exploitation or sale – is ineffective. Some or all of the 3 categories of non-"Required" cookies continue to operate on visitors including Plaintiff, notwithstanding visitors' rejection of such cookies on the Website. This continued operation results in third parties receiving additional data relating to visitors' activity on the Website, their devices and browsers. Thus Defendant's consent interface contains material omissions, including the omission of the fact that the Website would continue sharing information

about the visitor, her visit, and her device and browser with third parties notwithstanding the visitor's express rejection of such sharing and possible sale.

7. This continued, nonconsensual sharing of the information through the Third-Party Code harms the visitor by facilitating the unauthorized creation of detailed profiles of her subject to commercial exploitation, a decrease in the value of information about her and the chilling of her free online expression and inquiry. It means that additional data about her can be commercially exploited by third parties beyond her control.

8. Because the Third-Party Code operating on the Website, without permission, altered, used, accessed, provided a means of accessing, caused to be accessed the computers of Plaintiff and visitors to the Website similarly situated to Plaintiff, Kasper violated the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA").

9. Further, the operation of the Third-Party Code on the Website even after Plaintiff and other visitors similarly situated to her used Defendant's consent interface to reject data-sharing and selling by the Website, gives rise to a claim for common law fraud, deceit and/or misrepresentation. Defendant was unjustly enriched by its use of the Third-Party Code and a deceptive consent interface upon Plaintiff and other Website visitors similarly situated to her.

10. Kasper's non-consensual transmission of visitor data to data brokers and companies operating social media/advertising platforms also constitutes the aiding and abetting of common law intrusion upon seclusion by those third parties. Visitors, including Plaintiff, maintained a reasonable expectation of privacy with respect to their communications with Kasper over the Website, and the intrusion of data brokers and advertising platforms into those communications would be highly offensive to a reasonable person.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

12. Plaintiff resides in Ventura County, California. Defendant Kasper is a Delaware limited liability company with its headquarters located in New York, New York.

13. This Court has general jurisdiction over Defendant Kasper because it is headquartered in New York.

14. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because Defendant resides in this District.

**PARTIES**

15. Plaintiff Shandi Miller ("Plaintiff") is, and at all times relevant to this complaint has been, a California citizen, living in Ojai, California. Plaintiff maintains reasonable expectations of privacy when browsing websites.

16. Plaintiff identifies DOE Defendants 1 through 15 as unknown entities that Defendant directed and controlled to participate in implementing or maintaining Defendant's system. Plaintiff will seek leave to amend this Complaint to identify these entities when Defendant's discovery responses reveal their true names and roles.

17. Each DOE Defendant acted as Defendant's agent or employee in Defendant's implementation of the surveillance scheme described herein. Each DOE Defendant operated within the scope of its relationship with Defendant and participated with Defendant in the common plan to unlawfully track California residents for Defendant's commercial gain.

**FACTUAL ALLEGATIONS**

18. Defendant owns and operates the Website, which sells women's clothing.

19. Defendant runs scores of marketing campaigns for its products on the social media/advertising platforms operated by Meta: Facebook and Instagram. These campaigns appear on the "feeds" of subscribers to these two platforms.

20. Defendant has partnered with at least two registered California data brokers, The Trade Desk, Inc. ("Trade Desk"), and NextRoll, Inc. ("NextRoll") in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to Trade Desk and NextRoll (the "Data Broker Code") on the Website.

21. Defendant has also partnered with social media/advertising company Meta in order to deanonymize and develop clandestine user profiles on otherwise anonymous website visitors. Defendant has done this by installing code and tools proprietary to Meta (the "Meta Code") on the Website.

22. The Data Broker Code and the Meta Code (jointly the "Third-Party Code") deployed on the Website is designed to track and correlate visitors by capturing electronic impulses transmitted from the devices of visitors to a website on which it is deployed. The process initiated by the Trade Desk, NextRoll and Meta (the "Third Parties") identifies visitors through "browser fingerprinting." Fingerprinting allows data brokers like Trade Desk and NextRoll, and social media/advertising company Meta, to ascertain the identity of a website visitor by plotting hundreds of personal identifiers, including the visitor's geolocation, device information, identification and cross-referencing of malicious cookies installed on the visitor's devices, and other traits evident from the visitor's browsers.

**Browser Fingerprinting**

23. Why does it matter that data about a Website visitor such as the size of her screen, her device's brand name and her browser settings gets transmitted to Trade Desk, NextRoll and Meta? One would think that the sharing of such *seemingly* non-personal data cannot impact a visitor's life or experience. This assumption is simply incorrect.

24. The fact is that when you visit a website, ***and before you get to weigh in on whether you should be targeted with ads or identified***, hundreds of non-personal data points tell those data brokers and social media companies who you are. (These data points are *usually* accompanied by information such as the webpage you viewed just prior to arrival, and geolocation data.) Data brokers and social media companies may already have access to your name and email addresses, as well as other websites you have visited in the past, to combine and/or match with this incoming data from your device.

25. Examples of such data points are:

- Device type and configuration
- Browser type and version

- Operating system and version
- Screen resolution and color depth
- System language settings
- Time zone settings
- Installed fonts
- Installed browser plugins or extensions
- Device memory
- CPU class
- Canvas rendering characteristics
- WebGL rendering characteristics
- AudioContext processing characteristics
- Touch support and input capabilities
- Network connection type

26. To be clear, ***website operators*** require some of the data points at issue to render the contents of a page on a website on their visitors' devices. For example, a webpage will load properly on a visitor's screen only with information about a visitor's device characteristics and configurations, including screen size. What is being discussed here – and what is at issue in this action – is such data being provided, by a website operator's actions, to ***third parties not involved in operation of the website itself, or the rendering of the website's contents on the screens of visitors.*** The third parties do not need the data to operate any website, or for any purpose other than to identify, target and track website visitors.

27. As explained in an article in the October 2025 issue of *Wired Magazine*:

> Your browser fingerprint is a collection of innocuous information about your PC that, ***when put together, is unique enough that it could identify an individual***. Some of the components of your browser fingerprint include your computer's hardware, your browser and version, the various versions of software you have running in your browser, the fonts you have installed on your PC,

> your time zone, your system language, your keyboard layout; the list goes on. Out of the dozens of pieces of information, none of them could identify you individually. It's when this data is bundled together that your fingerprint becomes unique.[1]

28. The fingerprinting process works even when a visitor does not enter any items *colloquially referred to* as "personal data" – such as name, telephone number, address or email address – into a form on a website.

29. In 2025, researchers at U.S. universities found evidence of the use of browser fingerprinting by websites, particularly in connection with advertising.[2] Through research, Dr. Yinzhi Cao, Associate Professor of Computer Science and Technical Director of the Information Security Institute at Johns Hopkins University, and other scholars, have "correlate[d] browser fingerprints and ad behaviors, essentially establishing the relationship between web tracking and fingerprinting."[3] The Texas A&M University study confirms the ability of tracking software like the code at issue in this case to identify individual browsers, and therefore individuals, using non-personal data about devices and browsers: "Think of it as a digital signature you didn't know you were leaving behind. You may look anonymous, but your device or browser gives you away."[4]

**The Cycle of Third-Party Collection of Consumer Data and the Tracking of Consumers**

30. Collection of visitor data by entities such as Trade Desk, NextRoll and Meta – including collection by these entities of unique identifiers that the Third-Party Code assigns to visitors to the websites of companies like Defendant – enables ongoing tracking of website visitors

---

[1] Jacob Roach, "Here's What Your Browser Is Telling Everyone About You:
Your browser sends a lot of information with each website you visit. That can be used to track you across the internet." (Wired Magazine, Oct. 16, 2025), available at https://www.wired.com/story/what-is-browser-fingerprinting/ (last viewed 8/26/2026).

[2] Texas A&M Univ. Dep't of Computer Science and Engineering, "Websites Are Tracking You Via Browser Fingerprinting: New research provides the first evidence of the use of browser fingerprints for online tracking." (Texas A&M Stories June 26, 2025), available at https://stories.tamu.edu/news/2025/06/26/websites-are-tracking-you-via-browser-fingerprinting/ (last viewed 8/26/2026).

[3] *Id.*

[4] *Id.*

as they visit new websites in the future. At the same time, the tracking of a person's internet browsing going forward provides more opportunities for data collection (and profile building) about an individual. This cycle aids the advertising and/or data monetization efforts of Trade Desk, NextRoll, Meta and similar organizations.

31. As California Attorney General Rob Bonta explained in a 2022 California Superior Court complaint filed against retailer/website operator Sephora USA, Inc.:

> Consumers are constantly tracked when they go online. Sephora, like many online retailers, allows third-party companies to install tracking software on its website and in its app so that these third parties can monitor consumers as they shop. The third parties track all types of data; in Sephora's case, third parties can track whether a consumer is using a MacBook or a Dell, the brand of eyeliner that a consumer puts in their "shopping cart," and even the precise location of the consumer. Some of these third-party companies create entire profiles of users who visit Sephora's website, which the third parties then use for Sephora's benefit. For example, the third party might provide detailed analytics information about Sephora's customers and provide that to Sephora, or offer Sephora the opportunity to purchase online ads targeting specific consumers [ . . . ]. This data about consumers is frequently kept by companies and used for the benefit of other businesses, without the knowledge or consent of the consumer.

Complaint, *People of the State of California v. Sephora USA, Inc.*, CGC-22-601380, 2022 CA Sup. Ct. Pleadings LEXIS 38450 (Cal. Super. Ct., San Francisco Co., Aug. 24, 2022) (the "*Sephora* Complaint"), at 2:2-13.

**Registered California Data Brokers**

32. Registered California data brokers, such as Trade Desk and NextRoll, are companies whose core business is to collect, aggregate, analyze, and sell or license personal and

non-personal data about individuals and organizations. Data brokers operate largely behind the scenes, often without direct interaction with the individuals whose data they monetize.

33. Registered California data brokers gather information from a wide variety of sources, including by purchasing information from commercial sources like retailers, financial institutions, online marketplaces, subscription services, and loyalty programs.

34. Once the data is collected it is consolidated and organized into comprehensive profiles that may include thousands of attributes per individual. The data is then cross-referenced and linked using unique identifiers like device IDs and cookies to unify data about individual users from multiple sources.

35. Data brokers are accumulating data and profiling individuals to an alarming extent. As the CEO of a data broker recently described the extent of data brokers' surveillance abilities as to an otherwise anonymous individual: "We know who she is, what she watches, what she reads, and who she lives with. [We] also know who she follows on social media, what she buys online and offline, where she buys, when she buys, and more importantly, why she buys. We know that [she] has two children and that her kids drink lots of premium fruit juice. We can see that the price of the SKU she buys has been steadily rising on her local retailer's shelf. We can also see that [her] income has not been keeping pace with inflation."[5]

36. Given the amount of data available by way of California registered data brokers' practices, a company like Defendant has an incentive to partner with data brokers so that it can learn the identity of visitors in order to target them with specific marketing materials.

37. Here, Defendant partnered with Trade Desk, NextRoll and Meta by installing the Third-Party Code onto the Website. Defendant allows Trade Desk, NextRoll and Meta to access, use, and monetize the data provided by Defendant, in ways that remain undisclosed to the public.

---

[5] Lucas Ropek, "Data Broker Brags About Having Highly Detailed Personal Information on Nearly All Internet Users," Gizmodo.com (March 15, 2025), available at https://gizmodo.com/data-broker-brags-about-having-highly-detailed-personal-information-on-nearly-all-internet-users-2000575762 (last viewed 8/26/2026).

**Trade Desk Code**

38. Trade Desk is a data broker that collects data to build profiles about individuals without their knowledge or consent in order to sell ads. Trade Desk's technology is so comprehensive that it allows for marketers to push ads to "a specific location, at a given time, in front of a particular Internet user."

39. The Trade Desk code deployed on Defendant's site identifies a user by identifying their device and then matching this information with their database. According to Trade Desk, "[d]evices are identified through unique identifiers stored in cookies provided by device operating systems for advertising purposes, or are generated based on statistical algorithms applied to information about a device, such as the IP address and device type."

40. Simply by visiting a site with Trade Desk software deployed, Trade Desk is able to track user behavior across websites and apps using cookies, device fingerprints, and probabilistic matching. Trade Desk also connects a user's behavior across multiple devices (e.g., mobile, desktop, TV) to a single identity.

41. Trade Desk's business depends on identifying website users without their knowledge. In fact, Trade Desk has stated publicly that its business depends on "ingesting more identifiable information" about individuals. Such information would include information of visitors to Defendant's Website transmitted to Trade Desk due to the deployment of Trade Desk code on the Website.

42. The Trade Desk code deploys tracking cookies that are dropped on visitors' devices to follow users across the web. Cookies are pieces of software code placed by Trade Desk and stored on a user's web browser. Cookies allow Trade Desk to "distinguish between, recognize, and store data about unique web browsers and devices, and to store data on [Trade Desk's] servers[.]" The cookies further allow Trade Desk to "recognize web browsers across sites and over time, and therefore to record information about them over time." Trade Desk cookies store and cause the transmission of a unique identifier that enables Trade Desk (and other entities with access to the cookies) to track users as they navigate a website, and any subsequent website where the cookies appear.

43. Plaintiff was subjected to the Trade Desk code as described *supra* starting when she requested that the Website load on her device on April 6, 2026.

**NextRoll Code**

44. NextRoll is a marketing technology company specializing in retargeting and targeted advertising services. NextRoll appears on the California Data Broker Registry, indicating it trades in the personal data it collects (for example, by assembling audience segments or profiles that are used in advertising). NextRoll's services reach across a vast network of websites and advertising exchanges, and the company openly touts its ability to recognize users across different sites and even across devices for marketing purposes.

45. The NextRoll code on Defendant's Website is a snippet of JavaScript that website owners embed in their site's HTML, typically in the header. Once installed, a feature of the NextRoll Code called the "AdRoll pixel" tracks essentially every action a visitor takes on the site. NextRoll's own help center describes the AdRoll Pixel as code that "tracks everything your visitors are doing on your site." The NextRoll code functions as follows:

46. First, when a user loads a page, the NextRoll code executes and sends an HTTP request to NextRoll's servers, including various pieces of information about the visitor's session. According to NextRoll's documentation, the NextRoll code collects HTTP header data – this includes the user's IP address, their browser user agent (which reveals browser version and operating system), the referrer URL (i.e. where they came from), and the current page URL. In addition, the NextRoll code captures site-specific data: it attaches an "advertisable ID" and "pixel ID" to identify the website/ad account in NextRoll's system (so NextRoll knows which client's site the data came from). It then records user actions on the page (what NextRoll calls "Site Activity") such as page views, clicks on certain elements, form submissions, items added to cart, and other conversion events.

47. Second, NextRoll assigns each browser a "User identifier" the first time the AdRoll pixel sees that browser. This is a persistent cookie stored in the user's browser (often named something like "adroll" or "nextroll" cookie) that allows NextRoll to recognize the same user on subsequent visits or on other websites that also have AdRoll/NextRoll tracking. The NextRoll ID

cookie is "persistent" because it enables the tracking of the visitor beyond her visit to the website when the cookie is first installed. If another unrelated website also uses the NextRoll code, that same cookie ID will be recognized and the user's visit to that unrelated website will be captured as well, and associated with their existing profile.

48. Third, the NextRoll platform performs "cookie matching," meaning it will compare its own user identifier with identifiers used by other ad platforms in order to broaden the reach of tracking and ad delivery. If NextRoll's pixel technology finds a user, NextRoll can later synchronize that user's ID with, for example, a Facebook or Google cookie, to continue tracking the user's activity across the internet, storing all of the information collected in a discrete user profile.

49. Plaintiff was subjected to the NextRoll code as described *supra* starting when she requested that the Website load on her device on April 6, 2026.

**Meta Code**

50. Meta is a digital advertising behemoth, earning approximately $196.2 billion in advertising revenue in 2025 alone. It leverages data about consumers it receives because of Meta code installed and deployed on the websites of companies that seek to advertise on Meta platforms including Facebook and Instagram to produce its massive advertising haul. Meta code operates on approximately 9% of all websites worldwide.

51. The Meta code performs data collection, behavioral analysis, user retargeting, and analytics. It uses a sophisticated algorithm to track people, recently described by Meta whistleblowers as "absolutely relentless in the pursuit of people."

52. The Meta code allows Meta to obtain and store at least the following visitor data: (i) browsing history, (ii) visit history, (iii) website interactions, (iv) user input data, (v) demographic information, (vi) interests and preferences, (vii) shopping behaviors, (viii) device information, (ix) referring URLs, (x) session information, (xi) user identifiers, and (xii) geolocation data (including IP addresses).

53. Meta utilizes the data collected through the Meta code for its own purposes, including by using the data to tailor content and target advertisements to users. This includes

practices such as ad targeting and retargeting, in which Meta uses the Meta code to track users' online behavior across different sites, building a profile based on their browsing habits, purchases, and interactions. The profile enables Facebook to deliver highly targeted ads within the Facebook ecosystem and on other sites that are part of Facebook's audience network. Meta also uses the data for conversion tracking, in which Meta uses the Meta code to enable business partners to track specific actions users take after viewing or clicking on a Facebook ad, such as making a purchase or signing up for a newsletter. Data is also used for "Audience Insights and Analytics," a feature by which Meta provides data to businesses on user demographics, interests, and behaviors across their sites and apps. Meta also uses the data for cross-device and cross-platform tracking, in which Meta uses the Meta code to support tracking users across devices and platforms, so that ads are targeted consistently regardless of the device a user is on. This feature ensures that advertisers can follow users across devices.

54. Plaintiff was subjected to the Meta code as described *supra* starting when she requested that the Website load on her device on April 6, 2026.

**Troubling Implications of Third-Party Data Sharing**

55. Companies using third-party tracking software – such as the Third-Party Code described *supra* – seek to minimize its surveillance abilities and uses. They emphasize that the data collected by such software is being used simply to inform consumers about products they believe would be particularly appealing to them. However, there is no guarantee that consumer data supplied to data brokers or social media platforms will be used solely for advertising purposes.

56. As Attorney General Bonta explained in the *Sephora* case:

> The ramifications of this third-party surveillance can go beyond ordinary consumer profiling. Sephora's website allows visitors to browse and purchase products such as prenatal and menopause support vitamins—data points which can be used by third-party companies to infer conclusions about women's health conditions, like pregnancy. Moreover, when a company like Sephora utilizes third-party tracking technology without alerting consumers and

> giving them the opportunity to control their data, they deprive consumers of the ability to limit the proliferation of their data on the web.

*Sephora* Complaint, at 2:14-20.

57. As data brokers, Trade Desk and NextRoll can use data they received regarding Plaintiff's visit to the Website to further profile Plaintiff, with the objective of monetizing this data by selling or licensing it to other entities, including law enforcement and government agencies. The same can be said of data they received regarding visits of members of the putative Class in this action.

58. A recent report by the Brennan Center, a public policy nonprofit, has explained that "government agencies may purchase personal data to further their exercise of coercive powers, including the ability to deport, arrest, incarcerate, or even use lethal force."[6]

59. There are recent examples of tech companies exchanging information with the federal government in ways that threaten civil liberties and individuals with minority viewpoints. For example, U.S. Immigration and Customs Enforcement (ICE) has partnered with Palantir Technologies, a Denver-based software company, to use artificial intelligence and data mining to identify, track, and deport suspected noncitizens.[7]

60. Another example of such government data exchange is the provision by Meta, pursuant to valid warrants, of user data such as Facebook messages, for the purpose of investigating and prosecuting state crimes related to abortion.[8]

61. In February 2026, Google handed over user data to the United States Department of Homeland Security ("DHS" or "Homeland Security") in response to an administrative subpoena for the investigation of an individual based on the fact that he had written to a DHS attorney

---

[6] https://www.brennancenter.org/our-work/research-reports/closing-data-broker-loophole (last viewed 8/26/2026).

[7] https://www.americanimmigrationcouncil.org/blog/ice-immigrationos-palantir-ai-track-immigrants/ (last visited 8/26/2026).

[8] https://www.nbcnews.com/tech/tech-news/facebook-turned-chat-messages-mother-daughter-now-charged-abortion-rcna42185 (last visited 8/26/2026).

advocating on behalf of a refugee from Afghanistan in deportation proceedings.[9] No clear legal authority exists preventing the sale or dissemination of user data by Data Brokers to the federal government.

62. The New York Times reported on February 13, 2026, "Homeland Security is said to have sent Google and Meta hundreds of subpoenas for information to identify Americans who oppose ICE. Tech companies received legal requests for the names, email addresses, telephone numbers and other identifying data behind social media accounts that track or criticize the agency."[10]

63. In early March 2026, a news website reported about the existence of a U.S. Department of Homeland Security internal document revealing that Customs and Border Protection "bought data from the online advertising ecosystem to track peoples' precise movements over time …"[11]

**Data and Related Profiles of Consumers Have Economic Value**

64. The type of visitor data transmitted via the Website to Trade Desk, NextRoll and Meta has economic value – as is obvious from the facts that these third parties create code to collect it, and that Defendant has installed the code on the Website. The value of this data – that of Plaintiff as well as that of members of the Class on whose behalf Plaintiff has filed this action – was diminished by Defendant's deployment of the Third-Party Code on the Website.

65. The loss of anonymity that occurs through the type of visitor browser fingerprinting and subsequent tracking alleged herein imposes real costs on visitors to Defendant's Website,

---

[9] https://newrepublic.com/post/206088/homeland-security-67-year-old-us-citizen-criticized-email (last visited 8/26/2026).

[10] *Homeland Security Wants Social Media Sites to Expose Anti-ICE Accounts* (N.Y. Times Feb. 13, 2026), available at https://www.nytimes.com/2026/02/13/technology/dhs-anti-ice-social-media.html (last visited 8/26/2026).

[11] *CBP Tapped Into the Online Advertising Ecosystem To Track Peoples' Movements* (404 Media Mar. 3, 2026), available at https://www.404media.co/cbp-tapped-into-the-online-advertising-ecosystem-to-track-peoples-movements/ (last visited 8/26/2026); *see also Security News This Week: CBP Used Online Ad Data to Track Phone Locations* (Wired Mar. 7, 2026), available at https://www.wired.com/story/cbp-used-online-ad-data-to-track-phone-locations/ (last visited 8/26/2026).

including Plaintiff and members of the putative Class in this action. For example, in 2025, the Federal Trade Commission found that many websites use data such as "consumers' characteristics and behaviors, like location, demographics, browsing patterns and shopping history" to tailor consumer pricing.[12]

66. As recently explained by the Law Institute:[13]

> In the modern economy, identity information has been described as the business of buying and selling information as a commodity. Unlike traditional physical commodities, personal data is intangible yet holds immense economic value. The transformation of identity into a tradeable asset has occurred gradually as technologies for collecting and analyzing personal information have become increasingly sophisticated. [ . . . ] Personal identity in the digital realm comprises multiple elements. Demographic information includes age, gender, location, income levels, and educational background. Behavioral data tracks online activities such as websites visited, products viewed, and time spent on particular pages. Transaction histories reveal purchasing patterns, payment methods, and brand preferences. Location data from smartphones and wearable devices provides real-time information about movements and habits. What makes identity information particularly valuable is its predictive power. By analyzing past behaviors and preferences, companies can anticipate future actions with remarkable accuracy. This ability to forecast consumer behavior translates directly into competitive advantages in

---

[12] *See* https://www.ftc.gov/news-events/news/press-releases/2025/01/ftc-surveillance-pricing-study-indicates-wide-range-personal-data-used-set-individualized-consumer (U.S. Federal Trade Commission Jan. 17, 2025) (last visited 8/26/2026).

[13] https://thelaw.institute/cyberspace-technology-and-social-issues/identity-value-modern-economy/ (The Law Institute (Updated) Oct. 27, 2025) (last visited 8/26/2026).

> marketing and product development. A complex ecosystem has emerged around the collection and trading of identity information. This marketplace operates largely invisibly to average consumers, yet it powers much of the modern digital economy. The global data brokerage industry was valued at approximately $270.4 billion in 2024, with projections indicating growth to $473.35 billion by 2032. [ . . . ] Advertisers and marketers purchase identity information to target specific consumer segments with tailored messages. Behavioral advertising uses internet cookies and tracking technologies to understand browsing tendencies and create defined audience segments. This allows companies to place advertisements in front of consumers most likely to respond positively.

67. There exists an established market for the type of personal data collected and transmitted through the Third-Party Code running on the Website – data that facilitates the creation and enhancement of consumer profiles for individuals, and ongoing tracking of individuals' internet browsing. Defendant's surreptitious and unlawful transfer of personal information through the code on its Website diminished Plaintiff's and Class members' ability to participate in that market on informed terms, including to exercise the choice of whether to withhold, limit, or exchange their personal data for value.

**Defendant's Consent Interface and Plaintiff's April 6, 2026 Experience on the Website**

68. After the homepage of the Website loaded onto Plaintiff's computer during her April 6, 2026 visit, Plaintiff encountered a banner stating: "By continuing to use our website and selecting your Cookie Settings, you agree to our Privacy Policy and Terms & Conditions. We and our partners use cookies to enhance your experience. To learn more or manage your preferences, please click "Cookie Settings" and review our Cookie Disclosure in the Privacy Policy." Below this statement, on the banner, appears a single row containing, from left to right, (1) a hyperlink consisting of the phrase "Manage preferences" underlined; (2) a button bearing the word, "Accept"; and (3) a button bearing the word, "Decline." A screenshot of the banner appears below:




69. Defendant's consent banner purports to provide a visitor the choice to stop all of the cookies 'used' by Kasper and its "partners" from operating on the Website. It also purports to offer a visitor the option to control the use of cookies by setting her preferences.

70. If a visitor clicks on the "Manage preferences" hyperlink, a pop up banner with the heading "Cookie and privacy preferences" appears on the visitor's screen. To the right of the heading appear three buttons: (1) one bearing the words "Accept all"; (2) one bearing the words "Decline all"; and (3) one bearing the words "Save my choices." Below the heading and the buttons, the pop up reads:

> You control your data
>
> Learn more about the cookies we use, and choose which cookies to allow.

71. Below the above text, appears a description of 4 categories of cookies: (1) "Required"; (2) "Personalization"; (3) "Marketing"; and (4) "Analytics." The last 2 of these categories transmit data about visitors to the Website, their visits, their devices and their browsers to Trade Desk, NextRoll and Meta, and other third parties, that is used for fingerprinting, profiling,

targeted advertising and possible sale. On information and belief, so does the second category of cookies, "Personalization."

72. The description of each of the 3 categories of cookies other than "Required" are depicted in the below image of Defendant's consent pop up window:




73. The pop up displayed above purports to provide a visitor with the option to "Decline all" cookies other than "Required" ones. It also purports to provide a visitor with the option to select one or more of the 3 categories of cookies other than "Required" to indicate her choice to have the selected category or categories of cookies operate while she is visiting the Website, and then clicking on the button, "Save my choices."

74. When, on April 6, 2026, Plaintiff encountered Defendant's consent ***banner* – before the pop up above appeared** – she clicked on the "Decline" button. At that point, the banner disappeared, and Plaintiff was able to view or browse the Website.

75. When a visitor to the Website clicks on the "Decline all" button appearing on the Defendant's consent pop up window, the pop up window disappears, and the visitor is able to view or browse the Website.

76. When a visitor to the Website leaves the open box next to either the word "Marketing" or the word "Analytics" on the pop up empty – leaves both empty – and then clicks on the "Save my choices" button, the pop up disappears, and the visitor is able to view or browse the Website.

**The Consent Interface Defrauded Plaintiff and Other Website Visitors**

77. As demonstrated with respect to Plaintiff's April 6, 2026 visit to the Website in a recording known as a "HAR File," after Plaintiff rejected the use of non-"Required" cookies on the Website, the Third-Party Code deployed on Defendant's Website described *supra* continued transmitting Plaintiff's personal information to third parties including Trade Desk, NextRoll and Meta. That information included data that, on information and belief, identified her. The information was collected for commercial uses by Defendant, Trade Desk, NextRoll and Meta, including targeting Plaintiff and others with advertisements for Defendant's products. It was also collected by these third parties to build or enhance a profile of her, possibly for sale by Trade Desk and NextRoll to *other* third parties.

78. In other words, Plaintiff's exercise of her option to choose to continue visiting the Website without being subjected to cookies that facilitate data-sharing and data-selling by clicking on the "Decline" button had no impact on the operation of the Third-Party Code on the Website during her visit.

79. The type of data that continued to be shared with Trade Desk, NextRoll and Meta ***after*** Plaintiff rejected the use of non-"Required" cookies was similar to the data transmitted to Trade Desk, NextRoll and Meta ***before*** Plaintiff interacted with Defendant's consent interface. The same can be said of the data shared from visitors to the Website similarly situated to Plaintiff after they rejected the use of non-"Required" cookies through Defendant's consent interface.

80. Defendant's consent interface as described herein led Plaintiff, and all Website visitors similarly situated to Plaintiff, to believe that the Website would permit them to (1) "choose

which cookies to allow" to operate by clicking the "Decline" button; (2) prevent or halt the operation of all cookies not referred to by Defendant as "Required" by clicking the "Decline all" button; and (3) prevent or halt the operation of "Marketing" and/or "Analytic" cookies by leaving the boxes next to those words empty and clicking the "Save my choices" button. Plaintiff, and such visitors, therefore relied to their detriment on (1) Defendant's representations about confirming their choices with respect to the use of all non-"Required" cookies on the Website, and (2) Defendant's omissions regarding the fact that some or all of such cookies would continue to operate on the Website notwithstanding visitors' express rejection of them.

81. Defendant intended for such reliance to occur because Defendant profited through the continued operation of the Third-Party Code on the Website as to visitors who rejected the use of all non-"Required" cookies through Defendant's consent interface.

82. Defendant's misrepresentations and omissions about the ability of Plaintiff and other visitors to the Website similarly situated to Plaintiff to choose not to allow non-"Required" cookies to operate, and/or to prevent or halt the operation of non-"Required" cookies – or "Marketing" or "Analytics" cookies, or both, were known exclusively to, and actively concealed by, Defendant. The misrepresentations and omissions were not reasonably known to Plaintiff and members of the putative class. Further, Defendant's misrepresentations and omissions concerned material facts that were essential to the analysis undertaken by Plaintiff and putative Class members as to whether to remain on, and continue to use, the Website. The misrepresentations and omissions were material at the time made, because, when presented with Defendant's consent interface, Plaintiff and putative Class members had the option to leave the Website rather than be subjected to non-"Required" cookies, including "Marketing" cookies and "Analytics" cookies.

83. Defendant benefited and profited from its misrepresentations and omissions regarding visitors' ability to choose which cookies operate on the Website because such misrepresentations and omissions, *inter alia*, permitted (and continue to permit) Defendant to market and advertise its products to Plaintiff and putative Class members in a more effective and cost-efficient manner.

## CLASS ALLEGATIONS

84. Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class") defined as follows:

> **All persons who, while located in California, visited the Website during the applicable limitations period, and (1) when interacting with Defendant's consent interface, (a) clicked the "Decline" button on the consent banner, (b) clicked the "Decline all" button on the pop up window or (c) left the boxes next to the Marketing and/or Analytics empty and clicked the "Save my choices" button on the pop up window; and (2) remained on the Website.**

85. This action has been brought and may be properly maintained as a class action. There is a well-defined community of interest in the litigation and the proposed class is ascertainable.

86. NUMEROSITY: Plaintiff does not know the number of Class members but believes the number to be in the thousands, if not more. The exact identities of Class members may be ascertained by the records maintained by Defendant.

87. COMMONALITY: Common questions of fact and law exist as to all Class members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class member, include but are not limited to the following:

a. Whether Defendant's actions violate California common or statutory law;

b. Whether Defendant's representations and omissions in its consent interface were false when made;

c. Whether Defendant's representations and omissions were material to Plaintiff and Class members at the time they were made;

d. Whether Defendant intended to induce reliance by Plaintiff and Class members on its representations and omissions;

e. Whether Plaintiff and Class members are entitled to punitive damages;

f. Whether Plaintiff and Class members are entitled to injunctive relief;

g. Whether Plaintiff and Class members are entitled to the disgorgement of unlawfully obtained data; and

h. Whether Plaintiff and Class members are entitled to the disgorgement of profits.

88. TYPICALITY: Plaintiff was subjected to the Third-Party Code running on the Website when she visited the Website on April 6, 2026; she rejected the use of all non-"Required" cookies on the Website through Defendant's consent interface; and she remained on the Website after such rejection. Further, information about her activity on the Website and data that identified her was transmitted to Trade Desk, NextRoll and Meta, and possibly other third parties, for fingerprinting, identification and tracking purposes. Her claims are therefore typical of the Class.

89. ADEQUACY: Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the class or whose inclusion would otherwise be improper are excluded.

90. SUPERIORITY: A class action is superior to other available methods of adjudication because individual litigation of the claims of each Class member is impracticable and inefficient. Even if every Class member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed and address identical issues.

## FIRST CAUSE OF ACTION

**Violations of the California Comprehensive Computer Data Access and Fraud Act, Cal. Penal Code § 502 ("CDAFA")**

**(Against Defendant Kasper Group LLC and DOEs 1-15)**

91. Plaintiff realleges and incorporates each allegation in all preceding paragraphs contained herein.

92. The California Comprehensive Computer Data Access and Fraud Act ("CDAFA"), Cal. Penal Code § 502(a)-(e), makes it unlawful for parties to obtain data from a computer user outside of the scope of their authorization.

93. The stated legislative intent of CDAFA is to "expand the degree of protection afforded to individuals, businesses, and governmental agencies from tampering, interference, damage, and unauthorized access to lawfully created computer data and computer systems." Cal. Penal Code § 502(a). The Legislature did not limit CDAFA to "hacking" in the colloquial sense. Rather, the Legislature expressly declared that CDAFA should apply to various "forms of unauthorized access to computers, computer systems, and computer data" and serve to protect "the integrity of all types and forms of lawfully created computers, computer systems, and computer data," and that doing so was vital to protect the privacy of individuals. Cal. Penal Code § 502(a).

94. Under CDAFA, it is unlawful to knowingly take, copy or make use of any data from a computer. Cal. Penal Code § 502(c)(2).

95. The Third-Party Code "copie[d]" information contained on Plaintiff's computer, including browser information, computer make and model, routing information, and other technical characteristics, in violation of Cal. Penal Code § 502(c)(2).

96. The Third-Party Code also "ma[de] use of" information contained on the computers of Plaintiff by matching the above information with existing profiles in their pre-existing databases. The Third Parties conduct such matching to learn the identity of the website visitor.

97. Similarly, adding "data, computer software, or computer programs" to a device without consent violates CDAFA. Cal. Penal Code § 502(c)(4).

98. The Third-Party Code added data in the form of a small data file to Plaintiff's computer, so that it can track Plaintiff's movements on the Website, and on other websites she visits.

99. Penal Code Section 502(c)(6) makes third parties liable if they "[k]nowingly and without permission provides or assists in providing a means of accessing a computer, computer system, or computer network in violation of this section." By allowing the Third-Party Code to operate on the Website, despite stating that it would not do so when Plaintiff elected not to be

tracked through data-sharing and/or data-selling, Defendant knowingly and without permission assisted the Third Parties in accessing Plaintiff's computer.

100. Defendant's collaboration with the Third Parties – to subvert the purposes and functionality of Defendant's consent interface, and to copy and use Plaintiff's information (in an unauthorized manner) – overcame a technical barrier (the consent interface itself) to obtain unauthorized access to Plaintiff's computer.

101. Section 502(e) provides a private right of action for "compensatory damages and injunctive relief or other equitable relief." Additionally, a court may award reasonable attorney's fees and punitive damages on a case-by-case basis.

102. Defendant's use of Third-Party Code with the explicit intent of accessing, copying, and making use of data from Plaintiff's computer for tracking without consent violates CDAFA.

## SECOND CAUSE OF ACTION

### Common Law Fraud, Deceit and/or Misrepresentation

### (Against Defendant Kasper Group LLC and DOEs 1-15)

103. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

104. Defendant fraudulently and deceptively represented to Plaintiff and Class members that during their visits to the Website, Plaintiff and Class members could (1) "choose which cookies to allow" to operate by clicking the "Decline button; (2) prevent or halt the operation of all cookies not referred to by Defendant as "Required" by clicking the "Decline all" button; and (3) prevent or halt the operation of "Marketing" and/or "Analytic" cookies by leaving the boxes next to those words empty and clicking the "Save my choices" button.

105. The representations were false and deceptive, and omitted material facts, because after Plaintiff and the Class members rejected the use of all non-"Required" cookies, or of "Marketing" cookies, or "Analytic" cookies, or both, the Third-Party Code continued to operate on the Website during their visits. Such continued operation transmitted the personal data of Plaintiff and the Class members to Trade Desk, NextRoll and Meta for fingerprinting, targeting, profiling and other forms of commercial exploitation.

106. Defendant's misrepresentations and omissions about these facts were known exclusively to, and actively concealed, by Defendant. They were not reasonably known to Plaintiff and Class members at the time they were made. Defendant knew, or should have known, how its Website functioned, and how the Third-Party Code deployed on the Website operated – including whether any changes to its operation occurred after a visitor rejected the use of all non-"Required" cookies, or of "Marketing" cookies, or "Analytic" cookies, or both, using Defendant's consent interface by clicking on the "Decline" button, the "Decline all" button or the "Save my choices" button.

107. Defendant's misrepresentations and omissions about the ability of Plaintiff and the Class members to decline, halt or prevent the operation on the Website of some or all non-"Required" cookies were material when made because they concerned facts that were critical to the decision of Plaintiff and Class members whether to stay on and/or continue browsing the Website. Plaintiff and the Class members could have terminated their visits to the Website if they had learned that they would be subjected to some or all non-"Required" cookies, causing information about their activities on the Website, and data that identified them, to be transmitted to third parties including Trade Desk, NextRoll and Meta.

108. By making the misrepresentations and omissions, Defendant breached its duties to Plaintiff and the Class members. Defendant also profited from the breach, because the transmission of the information about Plaintiff and Class members through the Website's use of some or all non-"Required" cookies made Defendant's marketing and advertising more effective and cost-efficient. Plaintiff believes that additional ways in which Defendant profited from the fraudulent and deceptive practices described herein will be revealed through discovery.

109. Defendant intended to induce Plaintiff and Class members to alter their positions to their detriment by informing them that they could use the Website without being subjected to the Website's use of some or all non-"Required" cookies. Operating under the mistaken belief that they had rejected such use, and thereby had prevented or halted it, Plaintiff and Class members allowed more of their personal information to be transmitted to third parties, including Trade Desk, NextRoll and Meta, than they would have otherwise.

110. Plaintiff and Class members relied to their detriment on Defendant's misrepresentations and fraudulent omissions. Such reliance was justifiable and reasonable. There was nothing to indicate to Plaintiff or Class members that Defendant's consent interface contained misrepresentations and/or fraudulent omissions.

111. Plaintiff and Class members were injured as a direct and proximate result of Defendant's misrepresentations and fraudulent omissions, and their reasonable and justifiable reliance thereupon. Their injuries include the loss of money and/or property. The data of Plaintiff and Class members fraudulently and deceptively transferred to Trade Desk, NextRoll and Meta have economic value. Defendant's fraudulent and deceptive use of non-"Required" cookies, "Marketing" cookies and "Analytic" cookies, resulting in the transmission and possible sale of the personal information of Plaintiff and Class members to third parties (including Trade Desk, NextRoll and Meta), diminished the value of such information to Plaintiff and Class members. Further, Defendant's use of such cookies under the circumstances described herein injured the right of Plaintiff and Class members to control the distribution of their personal information, and the ways in which that information has been used, and currently is being used, by third parties. The injuries to Plaintiff and Class members also include the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; the mental distress of Plaintiff and Class members from knowledge of secret monitoring of them by Defendant, Trade Desk, NextRoll and Meta and other third parties; and the chilling of their free online expression and inquiry.

112. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's misrepresentations and omissions concerning the use of the Third-Party Code on the Website were made in a malicious, oppressive and willful manner. These misrepresentations and omissions were made in conscious disregard of the choice made by Plaintiff and the Class members to reject the use of some or all non-"Required" cookies on the Website – cookies that would transmit Plaintiff's and Class members' data to third parties for fingerprinting, identification, profiling, tracking and other forms of commercial exploitation, including sale.

## THIRD CAUSE OF ACTION

**Unjust Enrichment**

**(Against Defendant Kasper Group LLC and DOEs 1-15)**

113. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

114. Defendant intentionally aimed at increasing its sales and profits, improving its marketing and advertising while making it more cost-efficient, through its misrepresentations and fraudulent omissions concerning the choice of Plaintiff and Class members to reject being subjected to non-"Required" cookies during their Website visits – cookies that transmitted their data to third parties including Trade Desk, NextRoll and Meta.

115. There is no legitimate business reason that justifies Defendant's use of misrepresentations and fraudulent omissions concerning the choice of Website visitors to reject being subjected to non-"Required" cookies on the Website that transmitted their data to third parties to benefit Defendant financially and commercially.

116. Plaintiff and Class members conferred an economic benefit on Defendant through their decision to continue using the Website after they attempted to reject the use of non-"Required" cookies on the Website.

117. Defendant has been unjustly enriched by its conduct at the expense of Plaintiff and Class members.

118. Defendant understood the economic benefit it received from its unlawful behavior with respect to Plaintiff and Class members. Indeed, Defendant engaged in the unlawful conduct alleged herein in order to obtain the economic benefit it received from Plaintiff and Class members – and from all other visitors to the Website.

119. It would be unjust for Defendant to retain benefits and profits it received based on the value of the information about Plaintiff and Class members shared by Defendant with third parties including Trade Desk, NextRoll and Meta through the use of non-"Required" cookies. The data sharing resulting from the use of non-"Required" cookies was achieved unlawfully and wrongfully, and without the consent of Plaintiff and Class members.

120. Plaintiff and Class members are entitled to restitution of the benefits so received by Defendant. Further, they are entitled to any amounts required to place them in the position they occupied prior to Defendant's deployment of non-"Required" cookies on the Website (after Defendant had defrauded Plaintiff and Class members into believing that they had prevented or halted such deployment) to transmit their data to Trade Desk, NextRoll and Meta, and other third parties.

## FOURTH CAUSE OF ACTION

### Intrusion Upon Seclusion

### (Against Defendant Kasper Group LLC and DOEs 1-15)

121. Plaintiff and Class members reallege and incorporate each allegation in all preceding paragraphs contained herein.

122. Under California law, a defendant is liable for intrusion upon seclusion when it aids and abets the intentional intrusion of a third party into a private place, conversation, or matter in a manner that would be highly offensive to a reasonable person – or conspires with a third party to enable such an intrusion.

123. Defendant's deployment of the Third-Party Code on the Website aided and abetted the Third Parties' intentional intrusion into a private conversation or matter Plaintiff and the Class members were involved in – namely their visit to the Website and their communications with Defendant. The intrusion allowed Trade Desk, NextRoll and Meta to identify, profile and track (on an ongoing basis) Plaintiff and Class members.

124. Plaintiff and the Class members never authorized use of the Third-Party Code on the Website.

125. Plaintiff and Class members had an objectively reasonable expectation of privacy with respect to their conversation or exchange with Defendant over the Website.

126. Defendant's aiding and abetting the Third Parties' intrusion into Plaintiff's and Class members' visits to the Website was intentional, in that it involved deployment of software and configuration of the Website. Further, Defendant engaged in such conduct for its own economic benefit.

127. Deployment of tracking software that engages in the type of identification, profiling and tracking carried out by the Third-Party Code that Defendant installed on the Website forms the basis of an actionable intrusion upon seclusion claim under California law. *See, e.g., Caldwell v. InMobi Pte., Ltd.*, No. 25-cv-09977-AMO, 2026 LX 229530, at *7-14 (N.D. Cal. Apr. 29, 2026); *Casillas v. Six Flags Ent. Corp.*, 812 F. Supp. 3d 1016, 1029-30 (C.D. Cal. 2025); *Krzyzek v. Openx Techs., Inc.*, No. 25-cv-05588-SI, 2026 LX 42961, at *10-13 (N.D. Cal. Jan. 27, 2026).

128. The intrusion described herein would be highly offensive to a reasonable person because it facilitates ongoing, future tracking of an individual's internet browsing, which, in turn, enables the creation of detailed behavioral "cradle to grave" profiles of individuals. These profiles can provide information about intimate aspects of a person's life, including their medical conditions, political beliefs and religious practices..

129. Defendant's aiding and abetting the Third Parties' intrusion upon seclusion caused Plaintiff and the Class members significant injuries. These injuries include: Defendant's invasion of their legally protected privacy rights; their loss of control over personal identifying information due to Defendant's actions; the diminution in value of their data and identity; the unauthorized creation of detailed behavioral profiles of them due to Defendant's conduct; their mental anguish from knowledge of the secret monitoring of them by Defendant, Trade Desk, NextRoll and Meta; and chilling effects on their free online expression and inquiry due to Defendant's conduct.

130. The above-described invasion of the privacy of Plaintiff and Class members damaged them. They are therefore entitled to compensatory damages, which includes monetary damages.

131. Plaintiff and Class members are entitled additionally to punitive damages because Defendant's use of the Third-Party Code on the Website was malicious, oppressive and willful. That use includes both the installation of the Code and the configuration of the Website to bypass what Plaintiff and the Class members believed were their actions effectively preventing or halting the use of non-"Required" cookies on the Website. Defendant's actions were made in conscious disregard of the choice made by Plaintiff and the Class members to prevent or halt such use.

132. Plaintiff and Class members are entitled additionally to equitable relief in the form of enjoining Defendant from continuing to engage in its unlawful conduct, and disgorgement of profits earned by Defendant from its invasion of their privacy interests.

## **PRAYER**

WHEREFORE, Plaintiff, on her behalf and on behalf of the Class members, prays for the following relief against Defendant:

1. An order certifying the Class, naming Plaintiff as the representative of the Class and appointing Plaintiff's attorneys as Class Counsel;
2. Compensatory damages under the common law and under CDAFA, including any expenditure reasonably and necessarily incurred by Plaintiff in protecting her data pursuant to Cal. Penal Code § 502(e)(1);
3. An order enjoining further violations of CDAFA pursuant to Cal. Penal Code § 502(e)(1);
4. Disgorgement of money and data derived from Defendant's illicit deployment of the Third-Party Code on the Website during Plaintiff's April 6, 2026 visit under the common law and pursuant to Cal. Penal Code § 502(e)(1);
5. Reasonable attorneys' fees and related litigation expenses pursuant to Cal. Penal Code § 502(e)(2);
6. Punitive damages under the common law and pursuant to Cal. Penal Code § 502(e)(4);
7. For costs of suit; and
8. For any and all other relief, at law or in equity, that may be appropriate.

DATED: October 27, 2026 TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Shandi Miller*

**DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a trial by jury.

DATED: October 27, 2026

TAULER SMITH LLP

By: ______________________
J. Evan Shapiro, Esq.

*Attorneys for Plaintiff Shandi Miller*